**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PHILLIP ROY WOODLEY,<br><br>Petitioner,<br><br>v.<br><br>A. HEDGPETH,<br><br>Respondent. | Case No.: 1:12-cv-01905-LJO-JLT<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING THAT OBJECTIONS BE FILED WITHIN TWENTY-ONE DAYS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner was convicted in 2010 of two counts of first degree murder with special circumstances, first degree robbery, and first degree burglary. He is in custody of the California Department of Corrections and Rehabilitation serving two consecutive indeterminate sentences of life without the possibility of parole, pursuant to a judgment of the Superior Court of California, County of Fresno.

Petitioner appealed to the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed his conviction. (Doc. 15, Ex. A). Petitioner filed a petition for review in the California Supreme Court that was summarily denied. (Lodged Documents ("LD") 21).

///

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

In 1982, Woodley and his father, Roy Woodley, had a falling out. In February 2005, Woodley met Jeffrey Rancour. Woodley and Rancour regularly used methamphetamine together three or four times a week. Woodley paid Rancour for his drugs by painting Rancour's apartment and working on Rancour's car.

In July 2005, Woodley asked Rancour if he was "down with coming up" on something. Rancour understood "coming up" to mean acquiring a valuable item that could be sold at a higher price. On July 20, 2005, Woodley picked up Rancour and they drove to Roy Woodley's house. On the drive, they smoked methamphetamine and Woodley said something to the effect that it was a "good day" to "come up." When they arrived at the house, Woodley's stepmother, Angie Woodley, was surprised to see them. The two men stayed about 10 minutes and then left.

On July 21 or 22, Woodley again picked up Rancour and drove to Roy and Angie's house. They smoked methamphetamine on the drive. Angie again let them into the house; they began talking. Roy was in the shower; eventually he came into the front room and sat down in a recliner.

After talking for a few minutes, Woodley suddenly ordered his father to get on the floor. Roy and Angie did not take him seriously, so Woodley, using a more forceful voice, again ordered his father to the floor. When Roy took too long, Woodley pushed him. Woodley ordered Angie to put her hands behind her back and he began binding her with tape. Rancour fumbled when he tried to tape Roy, so Woodley did it.

Woodley took Angie down the hall. Roy asked Rancour what was going on; Rancour told Roy he did not know. When Woodley returned to the front room, he began yelling at his father. Woodley accused Roy of never giving him anything; Roy responded, "that's not true, I loved you."

Woodley directed Rancour to tie Roy's hands with an extension cord. Woodley lunged at Roy and appeared to punch him in the ribs. Woodley then went to the kitchen sink where he washed his hands and a knife. Roy tried to stand up. Woodley returned to the front room with the knife and began stabbing Roy. Afterwards, Woodley again went to the kitchen and washed his hands.

Rancour walked to the back room and saw Angie lying on the floor. The door to the bathroom was open and Rancour saw drops of blood in the sink. Rancour went back to the front room and saw Woodley going through Angie's purse.

Woodley directed Rancour to drive Roy's truck and to follow him back to Selma, where Woodley parked his car and got into the truck. The two men drove to Ronald Berry's house and Berry helped remove the camper shell and unload the tools from the truck. After the truck was unloaded, the men went inside and "smoked some dope."

Rancour made various phone calls trying to "get rid of the truck." Woodley and Rancour then drove the truck to meet up with Mark Haltom, who was going to try to get rid of the truck. Woodley and Rancour then followed Haltom to Larry Sigera's house. Woodley had a $1,500 check from Roy's account. While the men ingested drugs, Haltom's girlfriend, Amanda Gonzalez, called a relative at a bank to see if she could cash the check.

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

> Woodley gave Haltom and Gonzalez some credit cards. Sigera drove them all back to Berry's house in Selma. On the way back to Selma, they used one of the credit cards at a gas station. Woodley told Rancour he was expecting an inheritance from his father's estate and would split it with Rancour.
>
> At approximately 4:00 p.m. on July 22, 2005, Angie's daughter, Angela Gonzales, and her boyfriend, Dominic Padilla, discovered Roy's and Angie's bodies.
>
> On July 23, Dr. Venu Gopal, a forensic pathologist, performed an autopsy on both bodies. Gopal determined that Roy had been stabbed 31 times with the same blade. He opined that the number of stab wounds and the repetitive nature of the wounds indicated a crime of passion in which the victim and perpetrator knew each other. The cause of Roy's death was multiple stab wounds that penetrated the right carotid artery and left lung.
>
> Gopal indicated that Angie's cause of death was perforation of the right lung and heart due to multiple stab wounds. Her injuries included five stab wounds on the left side of her neck, four on the right side of her neck, three on the front of her chest, three on her right back, and two on the lower part of her chin.
>
> Woodley was interviewed by police on August 1, 2005; he stated he had been at his father's house the Wednesday before the murders. He claimed his fingerprints were on Angie's purse because he had helped her look for a paper with lottery numbers on it.
>
> Various telephone calls between Woodley and Valerie Jimenez were recorded by law enforcement on December 12, 2006. Jimenez told Woodley the sheriff's department wanted her to come in and answer some questions about why she had loaned her car to Woodley. Woodley told Jimenez to "Just tell them everything you know," to which Jimenez responded, "How stupid that is." Woodley also asked her why she was "panicking."
>
> Woodley was charged with two counts of murder, with the special circumstances of robbery, burglary, and multiple murders. He also was charged with first degree robbery and first degree burglary. As to all counts, it was alleged Woodley personally used a knife. It also was alleged that Woodley had suffered a prior serious felony conviction.
>
> Prior to Woodley's trial, Rancour pled guilty to two counts of manslaughter and three theft-related offenses.
>
> On April 9, 2010, a jury found Woodley guilty of all charges and found the special circumstances and the personal use of a knife allegation true. Woodley admitted the prior serious felony conviction.
>
> On June 14, 2010, the trial court imposed two consecutive life-without-parole terms for the murder convictions. The terms for the robbery and burglary convictions were stayed pursuant to Penal Code section 654.

(Doc. 15, Ex. A, pp. 2-4).

**DISCUSSION**

I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the

United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II. Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court

"must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

**III. Review of Petitioner's Claim.**

A. Failure To Investigate Alleged Juror Misconduct

Petitioner's sole contention is that the trial court abused its discretion in failing to make a thorough inquiry into purported juror misconduct. This contention is without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

> Woodley's sole contention on appeal is that the trial court abused its discretion by not making a thorough enough inquiry into juror misconduct. We disagree.
>
> **Factual summary**

On March 29, 2010, outside the presence of the jury, the trial court informed the parties:

> "Staff has informed the court that a juror contacted the court with a concern about a statement that Juror Number One apparently made to those other jurors concerning what coworkers may feel about the guilt or innocence of the defendant in this matter. I've spoken to counsel off the record in chambers concerning suggested responses to that. My inclination is to bring Juror Number One in and ask her whether she made the statement and, if so, whether that would affect her ability to be fair and impartial in this case and whether she could put aside anything she may have heard from anyone else and to further not engage in such conversations or repeat such conversations."

The trial court then asked if either party wished to be heard on the suggested procedure; neither party raised any objection or concern about the procedure.

The trial court then brought in Juror No. 1 and stated the following:

> "The court's received some information that at lunch the other day you had made a comment to other jurors that coworkers of yours had expressed an opinion as to the guilt or innocence of the defendant, and I want to ascertain whether or not that is something that, one, did occur, that there was some comment about that?"

Juror No. 1 then responded, "There was a comment made that somebody said in a joking way in my presence."

Juror No. 1 reported that her supervisor at work had indicated she knew on which jury Juror No. 1 was serving. Juror No. 1 responded to the comment by stating, "I don't want to talk about it." Another person then came up and made a comment to the effect, "I hope that jury finds that guy guilty." At that remark, Juror No. 1 got up and left her two coworkers.

The trial court asked if there was anything about the "conversation or contact" that would make Juror No. 1 feel she could not keep an open mind or be fair and impartial in the case. She responded, "No, not at all. It was said in jest. And they don't have any authority over me or any pressure." The trial court commented that Juror No. 1 took "appropriate" action to remove herself from the conversation. After this exchange, the trial court asked if either party had any questions of Juror No. 1; both parties responded negatively.

The trial court then went on to state:

> "I want to thank you for ending the conversation as you did. I'm going to again remind you that you can't form or express any opinions on the case or allow anyone to talk to you about the case or allow them to give you their opinions about the issues in this case. I'm also going to direct you not to discuss with the other jurors what we discussed with you here at this time and you will remain on the jury subject to all the other admonitions that the court's given you."

Juror No. 1 then returned to the jury room. The trial court asked the parties if they wished to be heard on the admonition or the conversation with Juror No. 1; both parties responded, "No." The trial court asked if both parties were ready for the full jury to come in; both parties responded, "Yes."

**Analysis**

Woodley now contends the trial court's inquiry was insufficient because (1) it did not interview the other jurors to see who had heard Juror No. 1's comment from her coworker, and (2) it failed to confirm that the impartiality of the other jurors was not affected by the remark.

A. Forfeiture

The California Supreme Court stated in People v. Holloway (2004) 33 Cal.4th 96, 126 that when the defendant does not "seek a more extensive or broader inquiry of the juror at the time, or in any other way object to the trial court's course of action," a claim of inadequate examination of a juror is forfeited.

Here, Woodley and his counsel were present during the questioning of Juror No. 1 and had multiple opportunities to object to the procedure; no objection was raised. When Woodley fails to object to the trial court's method of inquiring into possible juror misconduct, he cannot raise the issue for the first time on appeal. (People v. Holloway (2004) 33 Cal.4th 96, 126–127.) On this record, Woodley has forfeited his contention that the trial court conducted an inadequate inquiry into possible juror misconduct.

B. Merits of Woodley's argument

Considering the merits of Woodley's contention, we conclude the trial court did not abuse its discretion.

"'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.]'" (People v. Cleveland (2001) 25 Cal.4th 466, 478.) A hearing regarding a juror's alleged misconduct "'is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his [or her] duties and would justify his [or her] removal from the case. [Citation.]' [Citation.]" (Ibid.) "The specific procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion. [Citation.]" (People v. Seaton (2001) 26 Cal.4th 598, 676.)

"When a trial court is aware of possible juror misconduct, the court 'must "make whatever inquiry is reasonably necessary"' to resolve the matter. [Citation.]" (People v. Hayes (1999) 21 Cal.4th 1211, 1255 (Hayes).) Although courts should promptly investigate allegations of juror misconduct "to nip the problem in the bud" (People v. Keenan (1988) 46 Cal.3d 478, 532), they have considerable discretion in determining how to conduct the investigation. "The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ [,] including whether to conduct a hearing or detailed inquiry." (People v. Beeler (1995) 9 Cal.4th 953, 989 .) "'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.'" (People v. Avila (2006) 38 Cal.4th 491, 604.)

Here, the trial court acted promptly to conduct an inquiry upon receipt of information indicating possible juror misconduct. The trial court spoke to both counsel in chambers regarding the potential misconduct issue; that conversation was not reported. After that chambers conversation, the trial court announced the procedures to be followed in investigating the potential misconduct. On the multiple opportunities to inquire further of Juror No. 1, other jurors, or object to the procedures, Woodley raised no objection.

A fair inference from the questioning of Juror No. 1 is that her remark to other jurors was no more than that a coworker had commented on the case in a "joking way." It is not apparent that Juror No. 1 stated any more than this in one passing remark during lunch. The comment did not convey any outside information about Woodley or the crimes of which Woodley was being accused. Juror No. 1 was admonished by the trial court not to listen to remarks from others about the case, not to repeat those remarks, and not to talk to other jurors about what was discussed during the questioning in the courtroom.

> When the questioning of Juror No. 1 revealed that no prejudicial misconduct had occurred, the trial court declined to conduct any further inquiry, a decision with which Woodley concurred at the time. Juror No. 1's responses during the questioning revealed that she considered any remark she had heard from a coworker to be a joke; she did not engage with the coworker; and the remark did not affect her impartiality. The record, at most, indicates that Juror No. 1 had made one passing remark during lunch about a coworker's joking remark. There was no showing of potential prejudice.
>
> Arguably the trial court would have been obligated to conduct a further inquiry if "the defense [had come] forward with evidence that demonstrate[d] 'a strong possibility' of prejudicial misconduct ." (Hayes, supra, 21 Cal.4th at p. 1255, quoting People v. Hedgecock (1990) 51 Cal.3d 395, 419.) No such evidence was brought forth and the trial court was under no obligation to conduct further inquiries.
>
> Under these circumstances, we conclude the trial court did not abuse its discretion in the method and extent of inquiry into potential juror misconduct. (People v. Pinholster (1992) 1 Cal.4th 865, 928.)

(Doc. 15, Ex. A, pp. 4-6).

2. Federal Standard.

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to … trial … by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145 (1968). In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir.). Although it is generally preferred that a trial court hold an evidentiary hearing when allegations of juror misconduct arise, it is not always required, particularly when the court knows the exact scope and nature of the misconduct. See United States v. Halbert, 712 F.2d 388, 389 (9th Cir. 1983). The Court is mindful of the fact that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Rushen v. Spain, 464 U.S. 114, 118 (1983), *quoting* Smith v. Phillips, 455 U.S. 209, 217 (1982).

3. Analysis.

a. Procedural Default.

Respondent contends that Petitioner's claim must be rejected because it is procedurally defaulted, as found by the 5th DCA. After reviewing the facts and applicable law, the Court agrees the claim is procedurally barred.

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 86–87 (1977). Federal courts "will not review a question of federal law decided by a state

court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . ."); see also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935). This concept has been commonly referred to as the procedural default doctrine. This doctrine of procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32. If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (*citing* Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" Park, 202 F.3d at 1152 (*quoting* Ake v. Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court.")(*quoting* Ford v. Georgia, 498 U.S. 411, 424, 111 S.Ct. 850 (1991)). Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.'" Id. at 377 (*quoting* Morales, 85 F.3d at 1392).

California law requires that, with certain exceptions not applicable in this case, appellate courts will not consider claims of error that could have been, but were not, raised in the trial court. Peole v.

Vera, 15 Cal.4th 269, 275 (1997). That rule has been deemed both independent of federal law, People v. Williams, 16 Cal.4th 153, 208 (1997), and consistently applied, i.e., adequate. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).

Here, the record establishes that defense counsel did not tender a timely objection to the thoroughness of the trial judge's inquiry into the issue of juror misconduct; indeed, the record discloses that defense counsel appeared satisfied with the manner in which the trial judge handled the issue during trial. Hence, the state court's determination that the claim has been procedurally defaulted bars federal review in this case.

Petitioner's protestations to the contrary, the 5th DCA found that Petitioner's counsel did not lodge any request for an additional inquiry into the question of juror misconduct, and this Court, on habeas review, presumes those findings to be correct unless the contrary is shown by clear and convincing evidence, and the facts found by the state court are determined to be objectively unreasonable. Miller-El v. Cockrell, 537 U.S. at 340. No such showing of objective unreasonableness has been made here. Thus, the issue has been forfeited and federal habeas review is barred.

b. Merits.

However, even were the claim not procedurally barred, the claim would fail on its merits. First, Respondent correctly notes that the issue was never presented to the state court as a federal constitutional issue, but only as a state law claim. In his petition for review in the California Supreme Court Petitioner cites only state law and never raises any federal violation. (LD 20). Accordingly, to the extent that Petitioner purports to raise a federal issue herein, the issue is unexhausted and fails to raise a federal constitutional issue upon which habeas relief can be granted. To the extent Petitioner contends the appellate court misapplied California law, such claim is not cognizable by way of § 2254. A determination of state law by a state appellate court is binding in a federal habeas action, Hicks v. Feiock, 485 U.S. 624, 629, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988), unless the interpretation is an "obvious subterfuge to evade consideration of a federal issue." Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (federal habeas court must respect a state court's application of its own law and must not engage in de novo review). A federal court has no basis for disputing a state's interpretation of

its own law. Clemons v. Mississippi, 494 U.S. 738, 739–740, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

Second, Respondent also points out that no "clearly established" federal law exists as to the thoroughness of a state court's investigation into alleged juror misconduct. Thus, *ipso facto*, the state court adjudication cannot be contrary to or an unreasonable extension of clearly established federal law where no such clearly established law exists. 28 U.S.C. § 2254(d).

Moreover, it bears emphasis that Petitioner's claim is *not* that juror misconduct *actually* occurred that might have prejudiced the outcome of Petitioner's trial, but rather that the trial judge's investigation was insufficient to uncover any misconduct that *might have* existed. However, in the Court's view the 5th DCA adequately addressed the issue, pointing out that the trial judge promptly conducted a hearing during which he repeatedly solicited advice from both the prosecutor and Petitioner's counsel, that the offending juror was thoroughly examined about the incident in question, and that she evidenced no signs of having been influenced by the comments made by her co-worker. Neither attorney requested that other jurors be interviewed regarding potential prejudice resulting from any comments made by this juror about her co-worker. Moreover, the 5th DCA noted that the juror herself appeared to be completely unaffected by the comments, she was fully cautioned by the court not to listen to anything outsiders may say, not to form opinions about Petitioner's guilt until the conclusion of evidence, and not to discuss her thoughts with other jurors until they began deliberations. Also, there is no evidence in the record that the juror failed to follow these admonishments or that any other jurors expressed confusion, bias, or prejudice as a result of this incident.

Speculation about whether, in the absence of interviews with additional jurors, those additional jurors might have indicated, in some way, that they had been affected by the generalized comments made by this juror, is simply rank speculation. Petitioner and his attorney had ample opportunity during trial to request that additional jurors be questioned, and the fact that defense counsel did not make such a request is strong support for an inference that defense counsel did not feel it was necessary or justified under the circumstances. The Court also notes that Petitioner has not raised a claim of ineffective assistance of trial counsel for his attorney's failure to make such a request, raising yet another inference, i.e., that Petitioner did not consider trial counsel's omission to constitute deficient performance. Instead, Petitioner has limited his claim to an assertion that the trial court had a sua

sponte duty to conduct a further inquiry with the remaining jurors. Petitioner does not cite, and this Court is unaware of, any federal constitutional authority that such a wide-ranging investigation is required in order to meet federal constitutional standards. The state court found that, under state law, such an investigation was not warranted, and this Court is not in a position to second-guess the state court's application of its own laws. Therefore, Petitioner's sole claim for relief should be denied.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. **Within 21 days** after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within **10 court days** after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **March 18, 2015** **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE